770 A.2d 170

**Richard M. KREMEN, Trustee,**

v.

**MARYLAND AUTOMOBILE INSURANCE FUND.**

**No. 52, Sept. Term, 2000.**

Court of Appeals of Maryland.

April 13, 2001.

664

Leonard A. Orman (The Orman Law Firm, on brief), Baltimore, for appellant/cross-appellee.

Mark D. McCurdy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Annapolis, for appellee/cross-appellant.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

HARRELL, Judge.

On 7 November 1989, an automobile accident occurred in Anne Arundel County involving Gary Jones and David Boyce. At the time of the accident, Jones carried an automobile insurance policy with a $20,000 policy limit per individual. Boyce had a policy with underinsured driver coverage and a $50,000 policy limit. Boyce filed a motor tort lawsuit against Jones in the Circuit Court for Anne Arundel County seeking damages for personal injuries. Boyce offered pre-trial to settle his claim for Jones's $20,000 policy limit, but Jones's insurer, the Maryland Automobile Insurance Fund (Appellee or MAIF), refused the settlement offer. A jury trial resulted in a judgment for $82,882 in Boyce's (and his wife's) favor. MAIF paid to Boyce its $20,000 policy limit. Boyce's insurer paid him $30,000, being the difference between MAIF's payment and Boyce's underinsured motorist coverage.

Jones thereafter filed for bankruptcy. His trustee-in-bankruptcy, Richard M. Kremen (Appellant or Kremen), sued MAIF in the Circuit Court for Baltimore City for bad faith refusal to settle Boyce's motor tort claim for Jones's policy limits. A jury found in favor of Kremen, and the trial judge, declining to apply the collateral source rule to exclude from consideration the monies paid by Boyce's insurer to Boyce, awarded the bankruptcy estate $32,882, plus interest at the rate of 10 percent per annum from the date of the judgment in the motor tort case. Both parties appealed to the Court of Special Appeals.

On 23 July 2000, we, on our own motion, issued a writ of certiorari to the Court of Special Appeals prior to that court's consideration of the case. *Kremen v. MAIF*, 359 Md. 668, 755 A.2d 1139 (2000). Appellant presents the following issue:

Did the trial court err by failing to apply the collateral source rule in this case and in giving MAIF credit for the monies paid by the injured party's underinsured motorist insurance carrier?

In its cross-appeal, Appellee presents the following two issues:

Can the Trustee [Appellant] succeed in a bad faith refusal to settle a claim case when both MAIF and the Trustee's

predecessor-in-interest [Jones] agreed the case should not be settled, and when there was no unconditional settlement offered?

Was the trial judge correct in limiting damages in the bad faith case to the amount of money, plus interest, that Jones would have had to pay to satisfy the judgment entered against him in 1993?

## I.

On 7 November 1989, Gary Jones, while operating an automobile in Anne Arundel County, failed to yield the right of way, causing his vehicle to collide with David Boyce's Ford Aerostar van. At the time of the collision, Jones carried automobile-bodily injury liability insurance, providing a maximum coverage of $20,000 per injured individual, issued by MAIF. Boyce had an automobile liability policy, with uninsured motorist coverage and a $50,000 limit, with Harleysville Insurance Company (HIC). Boyce and his wife ("Boyce" has been used in the opinion occasionally to refer, as appropriate to the context, to either Mr. Boyce individually or Mr. and Mrs. Boyce) sued Jones in the Circuit Court for Anne Arundel County seeking compensation for personal injuries.[1]

Boyce, through his attorney, offered to settle the case for Jones's $20,000 policy limit,[2] but the offer was declined. According to MAIF, Jones agreed with MAIF that Boyce's claim

---

**1.** In the suit against Jones, Boyce asserted orthopedic, neurological, and psychological personal injuries. MAIF engaged an orthopedist to evaluate these claims. *See* notes 3 and 4, *infra*. Boyce and his wife also asserted a loss of consortium claim.

**2.** A letter, dated 30 December 1991, from Boyce's attorney to Jones's attorney (and copied to MAIF) advised, in pertinent part, that "after discussions with my client, David Boyce, he is willing to settle his case [against Jones] for the policy limits of your client.... This is an unconditional and unqualified settlement...." The letter appears to state that the offer would be withdrawn, unless accepted, 15 days prior to the scheduled trial date of 23 April 1992. There appears on the typed letter, however, a hand-interlineated notation where the "15 days" limitation is mentioned. That notation is the number "60" followed by the initials "DAB," apparently those of David A. Boyce,

should not be settled for the policy limit.[3] Following a jury trial held on 20 May 1993 in the Circuit Court, Boyce was awarded $70,303 for his injuries,[4] and $12,579 was awarded to Boyce and his wife for loss of consortium, for a total award of $82,882. MAIF paid its $20,000 policy limit to Boyce. HIC paid him $30,000, the difference between Boyce's $50,000 uninsured motorist coverage and the $20,000 paid by MAIF.

---

whose signature appears at the bottom of the letter, together with the signature of his attorney.

Apparently experiencing some lack of cooperation from Jones regarding discovery matters, Boyce's attorney wrote Jones's attorney again on 21 January 1993. After complaining about untimely and inadequate interrogatory responses, this letter stated, in pertinent part:

I put you and the liability carrier [MAIF] on notice that I need your policy limits offer so that I can invite the UM carrier [Harleysville] to intervene. If we wait too long, the UM carrier will be able to get out of this matter due to lack of timely notice. This will expose your client to the entire verdict and any contributions from Harleysville. Before Harleysville will even talk to me, I need to have the policy limits offer from your client's insured. It is my understanding that it is a low limit policy, but I have never had written verification of that. Until I have written verification that there is a minimum policy limit and the offer of that amount, I cannot attempt to perfect my claim against the UM carrier. If I cannot perfect my claim against the UM carrier, it is only reasonable and just that MAIF pay the entire amount of the verdict either on bad faith or because of prejudice to the UM process.

\* \* \*

I have counseled with my client and we have changed our standard letter [the 30 December 1991 demand letter] to advise you that the offer of settlement would automatically lapse sixty days prior to trial instead of fifteen.

3. The attorney MAIF engaged to defend Jones in the underlying motor tort case testified during the bad faith refusal to settle claim that Jones was "absolutely outraged" at the suit against him and "thought he was being victimized by Boyce." Appellant's attorney objected to these characterizations of Jones's mental state. The trial judge's response to the first objection, directed to the witness, was "[j]ust answer the questions. Don't give us your opinion as to the people's mood, et cetera." In response to the second objection, the judge instructed the witness, "[a]ll right. Stop. That's enough...."

4. In his deposition, Boyce claimed he suffered from right hip and lower back pain, headaches, and memory loss. He stated specifically that he experienced a clicking sensation and numbness in his right hip, a burning sensation and stiffness in his lower back that reduces his activities by 20 to 30 percent, and bi-weekly headaches.

Jones filed for bankruptcy. Richard M. Kremen (Appellant) was named the trustee of the bankruptcy estate.[5] Appellant filed suit on 12 August 1994 against MAIF in the Circuit Court for Baltimore City alleging that MAIF violated its duty

---

5. Included in the record in this case is the bankruptcy court docket for Jones's bankruptcy petition, as well as other documents and information relative to that proceeding. The record reveals that Jones filed a Chapter 7 petition on 3 December 1993 in the United States Bankruptcy Court for the District of Maryland (Case No. 93–5–8097–JFS). Kremen, appointed trustee of the bankruptcy estate on 10 December 1993, filed a trustee's report on 28 January 1994 asserting that there was no property available for distribution from the estate over and above that exempted by law. Thus, in his view, the petition presented a "no asset" bankruptcy.

On 4 March 1994, Boyce, through counsel, objected to the discharge of his judgment against Jones in the motor tort case (Adversary No. 95–5074–JFS) (the "adversarial proceeding"). On 16 March 1994, Bankruptcy Judge James F. Schneider entered a "Discharge of Debtor" order in the bankruptcy case, which discharged all of Jones's dischargeable debts, except the Boyce judgment, for which, *see infra*, all collateral activity was stayed pending the outcome of the adversarial proceeding.

According to the docket, on 10 May 1994, Judge Schneider granted Kremen's application to employ counsel for the bankruptcy estate to pursue the bad faith refusal to settle action against MAIF. Following a 13 June 1994 hearing on Boyce's claim, Judge Schneider ordered that final disposition of the Boyce complaint be stayed pending the resolution of Kremen's action against MAIF. Ten days after entering the stay order, Judge Schneider also granted Kremen's application to employ the same attorney who represented Boyce in the adversarial proceeding (but who had not represented him in the motor vehicle tort case) as special counsel to pursue the claim against MAIF. Another order, entered on 24 November 1999 by Judge Schneider, denied a contemplated dismissal of the Boyce claim in favor of continuing to stay the adversarial proceeding pending the resolution of the litigation that is now before this Court.

From the foregoing, we glean that: (1) Jones's bankruptcy filing was instigated by the outstanding judgment, a view espoused by one of Appellant's witnesses at the trial of the bad faith claim; (2) the Boyce judgment against Jones was not discharged by the 16 March 1994 order; (3) Boyce's adversarial proceeding to determine whether the judgment against Jones should be excepted from discharge has been stayed pending the outcome of the present action; and, (4) any amount recovered from the pursuit of the bad faith claim against MAIF, after payment of special counsel's fee, is destined for application by the bankruptcy estate to Boyce's outstanding judgment against the debtor, Jones. Thus, a substantial likelihood exists that, whatever the outcome of the present litigation, Jones will not realize any cash in hand; only Boyce may.

to attempt to settle the underlying motor tort case in good faith before trial for Jones's policy limits. Among other things, MAIF, relying on the testimony of the attorney it had engaged to defend Jones in the motor tort claim,[6] argued that Jones had agreed with MAIF to decline the offer to settle with Boyce because of the twin concerns that Boyce was inflating his injuries and possible exposure to a subrogation claim from HIC.[7]

Rejecting MAIF's evidence and arguments, the jury found in favor of Appellant and, on 10 November 1999, the trial judge ordered MAIF to pay Appellant $32,882, plus interest at the rate of 10 percent per annum from the date of the 20 May 1993 judgment in the Anne Arundel County case. This amount was reached by taking the $82,882 judgment in the Anne Arundel County judgment, and deducting MAIF's payment and the $30,000 which HIC paid to Boyce. The trial judge calculated the award in this manner after declining to apply the collateral source rule to HIC's payment, stating that an application of the rule would, in effect, permit Boyce to collect double damages.[8]

---

**6.** Jones did not testify at the trial on the bad faith refusal to settle claim.

**7.** MAIF argued that Boyce was demanding the $20,000 policy limit from MAIF while, at the same time, attempting to collect $50,000 under the underinsured motorist provision of his HIC policy. MAIF suggested that HIC "wanted to be sure that their [sic] subrogation rights had not been prejudiced by Mr. Boyce because they intended to go after Mr. Jones for any monies they paid out over our policy limits."

Although the record reflects that HIC made preparatory requests of Boyce for information and documentation to protect its right to seek subrogation from Jones if it ultimately paid benefits to Boyce under the underinsured motorist coverage, there is no documentary evidence corroborating the testimony at the bad faith refusal to settle trial of Jones's attorney in the motor tort case or the corporate designee of MAIF that the potentiality of a subrogation claim against Jones played any role in MAIF's calculus leading to rejection of the $20,000 settlement offer. On this point, MAIF's corporate designee, Mr. Sindler, and Appellant agreed. Moreover, it is pellucid on this record that HIC never asserted a subrogation claim against Jones as to the $30,000 it paid to the Boyces. Limitations on the assertion of such a claim have expired.

**8.** The trial judge concluded that:

Appellant appealed the judgment in the Baltimore City case, arguing that the trial court erred by failing to apply the collateral source rule, thereby effectively giving MAIF credit for the monies paid by HIC, the injured parties' insurer under their underinsured motorist coverage. In its cross-appeal, MAIF asserted two issues. First, MAIF argued that Appellant cannot succeed in a bad faith refusal to settle a claim case when both MAIF and Appellant's predecessor-in-interest agreed the case should not be settled, and when there was no unconditional settlement offered. Second, MAIF argued that the trial judge was correct in limiting damages in the bad faith case to the amount of money, plus interest, that Jones would have had to pay to satisfy the judgment entered against him on 20 May 1993 in the Anne Arundel County case.

## II.

Appellant asks us to determine whether the trial court erred by failing to apply the collateral source rule in this case and by effectively giving MAIF credit for the monies paid by HIC under Boyce's underinsured motorist coverage. For the reasons set forth below, we hold that the Circuit Court for Baltimore City should have applied the collateral source rule, and therefore erred when it credited HIC's $30,000 payment to Jones toward the $62,882 deficit remaining on the Anne Arundel County judgment.

----

Given the purpose of underinsured motorist insurance coverage, it makes no sense that the Plaintiff should recover twice for that which truly is not first-party insurance. As in *State Farm* above, a second payment "would clearly constitute a duplication of benefits in violation of the general legislative purpose reflected in [§ 19–513(b)]." (quoting *State Farm v. Ins. Comm'r*, 283 Md. 663, 675, 392 A.2d 1114, 1120 (1978)). Md.Code (1974, 1997 Repl.Vol.), § 19–513(b) of the Insurance Article states:

(b) *Duplicate and supplemental benefits prohibited.*—Notwithstanding any other provisions of this subtitle, a person may not recover benefits under the coverages described in §§ 19–504 [minimum liability coverage], 19–505 [personal injury protection coverage], 19–509 [uninsured motorist coverage], and 19–512 [collision coverage] of this subtitle from more than one motor vehicle liability insurance policy or insurer on a duplicative or supplemental loss.

## A.

It is necessary first to provide a brief history of the collateral source rule, long established, under Maryland law. We provided a plenary explanation of the rule in *Plank v. Summers,* 203 Md. 552, 562, 102 A.2d 262, 267 (1954), where we held that the jury should have been allowed to consider the reasonable value of medical services rendered to the serviceman-plaintiff by a United States Navy hospital, free of charge, when awarding him damages arising out of a non-military motor tort case, for he could have recovered otherwise the value of those services. In reaching this conclusion, we cited and discussed numerous cases from the majority of jurisdictions, both state and federal, including *Sainsbury v. Pa. Greyhound Lines,* where the Fourth Circuit Court of Appeals noted that "[i]t is generally well settled [under Maryland law] that the fact that the plaintiff may receive compensation from a collateral source (or free medical care) is no defense to an action for damages against the person causing the injury." *Plank,* 203 Md. at 561, 102 A.2d at 266 (quoting *Sainsbury v. Pennsylvania Greyhound Lines,* 183 F.2d 548, 550 (4th Cir. 1950)). Our opinion in *Plank* rested, however, on the law enunciated in the following cases:

In Maryland, in *City Pass. Ry. Co. v. Baer,* (1899), 90 Md. 97 [44 A. 992], in a suit for injuries sustained in attempting to board a trolley car, it was held that any sick benefits received by the plaintiff from any source other than the defendant were not to be considered by the jury in arriving at their verdict. In *Chesapeake Iron Works v. Hochschild,* (1913), 119 Md. 303, 86 A. 345, this Court held that in a suit for damages the fact of insurance could not be set up in mitigation of damages and it was no defense that the injured party had been indemnified by such insurance although he may have collected all or a part of it. In *American Paving & Con. Co. v. Davis,* (1916), 127 Md. 477 [96 A. 623], it was held that in an action for damages by fire through the negligence of the defendant, evidence that the plaintiff had received insurance money from fire insurance, which he had carried against loss by fire, is not proper for

the consideration of the jury. In *Barnes v. United Ry. Co.*, (1922), 140 Md. 14 [116 A. 855], it was held that the fact that the truck was insured did not disentitle the plaintiffs to maintain a suit for damage to the truck.

*Id.* For more recent applications of the *Plank* explanation of the collateral source rule, see *Riemer v. Columbia Med. Plan, Inc.*, 358 Md. 222, 246, 747 A.2d 677, 680 (2000) ("The third-party tortfeasor is liable to the injured victim for his or her damages regardless of whether the victim, an HMO, or any other insurer has paid for that medical care."); *Motor Vehicle Admin. v. Seidel*, 326 Md. 237, 254, 604 A.2d 473, 481 (1992) (" 'Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant.' " (quoting *Restatement (Second) of Torts,* § 920(A), comment b (1977))); *Meyers v. Meagher,* 277 Md. 128, 133, 352 A.2d 827, 829 (1976) ("The fact that the bill was subsequently paid by Mr. Meagher's Blue Cross and Blue Shield coverage may give rise to a right of subrogation, but does not operate in mitigation of Mrs. Meagher's recovery [of damages]."); *Blocker v. Sterling,* 251 Md. 55, 57, 246 A.2d 226, 228 (1968) (arguing that "a claimant who has received benefits from a third person may nevertheless recover the same amount as part of his damages owed by the tortfeasor because the wrongdoer cannot escape responsibility for the full consequences of his wrong"); *Nicholson v. Blanchette,* 239 Md. 168, 187, 210 A.2d 732, 743 (1965); *Simco Sales Service, Inc. v. Schweigman,* 237 Md. 180, 189, 205 A.2d 245, 250 (1964); *Kilgore v. Collins,* 233 Md. 147, 158, 195 A.2d 703, 709 (1963).

## B.

■ Given the unusual posture of the present case, we are asked whether the collateral source rule may apply in a bad-faith refusal to settle claim by an insured against his insurer. Specifically, we are asked whether MAIF is liable to Appellant, who nominally stands in the place of Jones,[9] MAIF's

---

9. Based on the information regarding the arrangements made in Jones's bankruptcy case regarding the Boyces' judgment, *see* note 5,

insured, for the entire judgment awarded to Boyce in excess of Jones's policy limits, despite the fact that HIC, Boyce's insurer, paid $30,000 to Boyce, under Boyce's underinsured motorist coverage in his policy. To get at the pith of the problem, we must decide initially whether the claim sounds in contract or tort, and so we turn our attention to *Mesmer v. Maryland Automobile Ins. Fund,* 353 Md. 241, 725 A.2d 1053 (1999).

In *Mesmer,* we were asked to consider whether an insurer's refusal to defend its insured was an action sounding in contract or tort.[10] 353 Md. at 249, 725 A.2d at 1056. Addressing this issue, we noted that

[u]nder the typical liability insurance policy, the insurer has a duty to indemnify the insured, up to the limits of the policy, for the payment of a judgment based on a liability claim which is covered. The insurer also has a duty to defend the insured against a liability covered or which is

---

*supra,* however, it appears Jones would not experience a "windfall" if the collateral source rule applies. It seems that every net dollar realized in the present litigation will pass through Appellant to the Boyces. If anyone stands to receive a potential "windfall," it will be the Boyces, and that will be affected by the contingency fee due Appellant's counsel under the 22 June 1994 Order of the Bankruptcy Court. For the Boyces to receive the benefit of the collateral source rule seems wholly unremarkable, as that is typically who benefits from the rule, i.e., the injured parties who recover both from the tortfeasor (and, in this case, the tortfeasor's tortfeasor) and again, to some extent, from their own insurer because they paid premiums for the relevant coverage.

10. While the law discussed in *Mesmer v. Maryland Auto. Ins. Fund,* 353 Md. 241, 725 A.2d 1053 (1999), directs our analysis of the present case, we note that the result we reached in *Mesmer* is the opposite of the one we reach today. We distinguish *Mesmer* from the current case, however, on the following linchpin, addressed in greater detail *supra.* In *Mesmer,* the insurer erroneously took the position that it had no contractual obligation to defend its insured's claim. 353 Md. at 263, 725 A.2d at 1063. By refusing to undertake any defense against the claim, the insurer became liable only for breach of contract. *Id.* In the present case, the insurer assumed the responsibility of providing a defense for Jones against Boyce's claim, thus transmuting the basis for this action from the realm of contract into the realm of tort, provided that Appellant could establish that MAIF acted in bad faith. See Part III.A for our discussion of the record evidence supporting Appellant's bad faith claim.

potentially covered. The source of both duties is solely the insurance contract.

353 Md. at 257, 725 A.2d at 1061 (citing *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 409, 347 A.2d 842, 851 (1975) (stating that "the promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums")). Nevertheless, we recognized that an insurer can be sued by its insured in tort for wrongful failure to settle a claim. *Mesmer*, 353 Md. at 259, 725 A.2d at 1061. Specifically, we found that "[t]he tort action can only arise when the liability insurer acknowledges coverage, or proceeds as if there were coverage, and undertakes to provide a defense to the insured." *Mesmer*, 353 Md. at 262–63, 725 A.2d at 1063 (citing *Allstate Ins. v. Campbell*, 334 Md. 381, 393–94, 639 A.2d 652, 658 (1994) (recognizing that "if a liability insurer acts improperly in defending the insured it may become liable [in tort] to the insured")); *see Mesmer*, 353 Md. at 260, 725 A.2d at 1062 (quoting *State Farm v. White*, 248 Md. 324, 329, 236 A.2d 269, 271 (1967), which states that "the liability is in tort, not in contract, although arising out of a contractual undertaking" (quoting *Sweeten, Adm'r. v. Nat'l Mutual*, 233 Md. 52, 55, 194 A.2d 817, 818 (1963)))).

■ In this case, MAIF not only acknowledged that it had a contractual obligation to defend Jones against Boyce's claim, but actually undertook to provide a defense. Although we reserve for the moment our discussion of the record evidence that supports the trial court's finding that MAIF acted in bad faith when it refused to settle the underlying claim, see Part III.A, we note for now that there is such evidence in the record. In light of the *Mesmer* standard, we hold that Appellant could maintain a tort action against Jones's insurer for bad faith refusal to settle a claim.

## C.

■ Having concluded that Appellant's action against MAIF arises in tort, we must now determine the proper

method for calculating damages in tort actions based upon a liability insurer's wrongful failure to settle within policy limits a claim against its insured. Ordinarily the measure of damages in a bad faith failure to settle case is the amount by which the bonafide judgment rendered in the underlying action exceeds the amount of insurance coverage. *See Medical Mut. Liab. Ins. Soc'y of Maryland v. Evans,* 330 Md. 1, 25, 622 A.2d 103, 114 (1993); see also *Campbell,* 334 Md. at 393–394, 639 A.2d at 658 (recognizing that "if a liability insurer acts improperly in defending the insured it may become liable [in tort] to the insured for the amount of judgment obtained against the insured which is in excess of the policy limits"); *State Farm v. Schlossberg,* 82 Md.App. 45, 63, 570 A.2d 328, 336–37 (1990) (concluding that the "proper method of assessing damages in [a bad faith refusal to settle action] is the difference between the insurance coverage and the jury verdict in the underlying [tort] case"). This method, we conclude, incorporates the application of the collateral source rule discussed in Part II.A, *infra.*

In the present case, the Baltimore City jury found that MAIF violated its duty to attempt to settle the underlying motor tort case in Anne Arundel County, in which Boyce was awarded $82,882 in damages, within Jones's $20,000 policy limit. By failing to apply the collateral source rule in the bad faith tort action, the Baltimore City trial judge erred when he awarded Appellant only $32,882.[11] We hold that the trial judge should have applied the *Medical Mutual* formula and awarded Appellant $62,882 (plus 10 percent interest, per annum, accruing from the 20 May 1993 award date); i.e., the $82,882 awarded to Boyce, less the $20,000 previously paid by MAIF, but excluding the $30,000 paid by HIC.

---

11. Jones apparently was of the view that he owed $62,882 on the Boyces' judgment for that was virtually the amount he reflected in the relevant schedule appended to his 13 December 1993 bankruptcy petition. *See* note 5, *supra.*

## III.

In its cross-appeal, MAIF asserts two issues: [12] whether Appellant can succeed in a bad faith refusal to settle a claim case when both MAIF and Appellant's predecessor-in-interest agreed the case should not be settled and when there was no unconditional settlement offered; and, whether the trial judge was correct in limiting damages in the bad faith case to the amount of money, plus interest, that Jones would have had to pay to satisfy the judgment entered against him in 1993. For the following reasons, we find that MAIF's arguments are without merit.

### A.

 MAIF argues that Appellant cannot succeed in a bad faith refusal to settle case when both it and Appellant's predecessor-in-interest agreed the case should not be settled, and when there was no unconditional settlement offered. We conclude that the record evidence presented a triable issue for the jury in this regard and that record evidence supports what the jury and trial court concluded.

 In making this determination, we resolve all conflicts in testimony in favor of the prevailing party, and we assume the truth of the evidence on its behalf, as well as of the reasonable inferences drawn from that evidence in its favor.

---

12. MAIF also urges this Court to adopt a standard whereby, in the absence of a conflict of interest between an insured and an insurer, a bad faith refusal to settle claim against an insurer cannot be maintained. MAIF argues that "no reported Maryland case has specifically addressed whether the cause of action requires such a showing as a basis for the lawsuit," and that our resolution of this case should establish this requirement. We shall decline to address this question. MAIF provides virtually no support for its contention. Moreover, given the evidence of record, discussed *supra,* we reiterate our conclusion in *Mesmer,* which stated that "when the insurer undertakes to provide a defense ... it has 'the exclusive control of ... settlement and defense of any claim or suit against the insured,' and it is at this stage that the 'potential, if not actual, conflict of interest giving rise to a fiduciary duty' comes into being." 353 Md. at 262–63, 725 A.2d at 1063 (alterations in original) (quoting *Sweeten Adm'r v. Nat'l Mutual,* 233 Md. 52, 55, 194 A.2d 817, 818 (1963)).

*See Waple v. Hall,* 248 Md. 642, 656, 238 A.2d 544, 551 (1968); *Yale Exp. System, Inc. v. Brown,* 235 Md. 484, 489, 201 A.2d 863, 865 (1964). Moreover, we do not consider the weight of the evidence, only its sufficiency to submit the case to the jury. *See Boob v. Fisher,* 225 Md. 278, 281, 170 A.2d 298, 299 (1961). "If there is any evidence, however slight, legally sufficient as tending to prove the matters alleged, that is to say, competent, pertinent and coming from a legal source, the weight and value of such evidence will be left to the jury." *Weil v. Lambert,* 183 Md. 233, 243, 37 A.2d 312, 316 (1944) (citing *Miller v. Loyal Order of Moose,* 179 Md. 530, 535, 20 A.2d 156 (1941); *Roycroft v. Nellis,* 171 Md. 136, 141, 188 A. 20 (1936)).

In his 15 December 1999 memorandum opinion, the Baltimore City trial judge found that there was sufficient evidence in the record for the jury to have determined that MAIF should have settled Boyce's motor tort claim for the $20,000 policy limits:

> (1) Mr. Boyce through his attorney was willing to release his insurance carrier, [HIC], and thus terminate any possibility of further claims arising out of the underlying accident; and (2) MAIF did not conduct a full investigation with regard to Mr. Boyce's head injury. Evidence of the head injury when considered with the amount of special damages asserted could have caused the jury to believe that MAIF did not act in good faith with regard to its fiduciary duty to Mr. Jones. To be sure, there was sufficient evidence, if believed, that could cause the triers of fact to find as they did.

A review of the record reveals that such evidence was indeed present. In a 30 December 1991 letter, sent to both MAIF and Jones's attorney, Boyce's attorney offered to settle the motor tort claim:

> Please be advised that after discussions with my client, David Boyce, he is willing to settle his case for the policy limits of your client [Jones].

This is an *unconditional and unqualified* settlement and this offer will be withdrawn 15 days prior to the above trial date [23 April 1992].

Please immediately advise if you wish to accept this settlement or if you need any further cooperation from us to properly adjust this claim within the policy limits of your insured.

As discussed in note 2, *supra,* Boyce's attorney wrote a subsequent letter on 21 January 1992 to Jones's attorney indicating, among other things, the possibility that a claim against Boyce's underinsured motorist coverage might be pursued if Jones's policy limit was as low as he had assumed for purposes of making the $20,000 demand presented in the December 1991 letter.

Jones's attorney wrote to MAIF on 24 January 1992, without copying Jones, characterizing Boyce's attorney as thinking "he has a policy limits case and threatens us with bad faith if we do not submit our limits so that he may attack the UM carrier," but stating nonetheless that he (Jones's MAIF-assigned counsel) was "fully prepared to try the case and roll the dice." Morever, in another letter of the same date, Jones's attorney wrote to Boyce's attorney, copying MAIF, but again not Jones, asserting, expressly in response to Boyce's attorney's 21 January 1992 letter, *see* note 2, *supra,* that "it is not my assessment of this case that it is a policy limits case for MAIF" and that "if [MAIF] offers policy limits [to Boyce], it will be against my advise and recommendation." In neither letter from Jones's counsel was concern expressed about Jones's exposure to a possible subrogation claim by HIC if Boyce received benefits under Boyce's underinsured motorist coverage. Thus, even if, as MAIF argues, the injection of Boyce's possible claim against HIC represented, as a matter of law, a contingency in Boyce's $20,000 "unconditional" offer to settle, Jones's exposure to a possible subrogation claim by HIC did not appear to form any part of Jones's attorney's or MAIF's considerations in deciding to reject the offer. Indeed, contrary to Jones's attorney's testimony, an inference could be drawn that Jones was not aware of the settlement offer or its

rejection, let alone any theoretical exposure to a subrogation claim by HIC.[13] The jury, apparently rejecting the testimony

---

13. MAIF was aware that, through *negotiations, arrangements might be* made to protect its insured against subrogation claims in similar instances. MAIF's corporate representative, MAIF's attorney at the trial of the bad faith claim, and the trial judge had the following colloquy in that regard:

[MAIF'S ATTORNEY]: Okay. And what do you mean by subrogation right? What does that mean?

[MAIF'S DESIGNEE]: In other words, if Harleysville pays any money in this claim, then they have the right that Mr. Boyce would have to come after Mr. Jones personally.

[MAIF'S ATTORNEY]: Because Mr. Jones caused the accident?

[MAIF'S DESIGNEE]: That is correct. Mr. Jones was the at-fault party.

[THE COURT]: Are you saying that if there is UIM [uninsured/ underinsured motorist] coverage, you just don't, and you evaluate the case at greater than policy limits that you just don't pay it because of that?

[MAIF'S DESIGNEE]: No, I didn't say we would not, always not pay it. *We would try to get a waiver of subrogation* or we would pay it. [Emphasis added].

During cross-examination, MAIF's designee acknowledged that it made no effort in Jones's case to seek a waiver as to HIC's potential subrogation claim:

[APPELLANTS ATTORNEY]: And it is the insurance company's obligation, is it not, if a case has a value in excess or at policy limits to settle the case for policy limits and possibly get the plaintiff to waive going after the under-insured coverage, correct?

[MAIF'S DESIGNEE]: Sure.

[APPELLANT'S ATTORNEY]: Now there have been times when you have gone and said hey, this case could be more than $20,000 and this guy has got a UIM thing. I am going to try and see if I can get this case settled for the $20,000 and just let it all go away, right?

[MAIF'S DESIGNEE]: Yes.

[APPELLANT'S ATTORNEY]: You didn't do that in this case, did you?

[MAIF'S DESIGNEE]: No, we did not.

\* \* \*

[APPELLANT'S ATTORNEY]: If Mr. Jones had no assets or few assets, isn't it the practice often for UIM carriers to waive subrogation if they are required to make payments?

[MAIF'S DESIGNEE]: It can be done, sure.

[APPELLANT'S ATTORNEY]: Sure. Because they are not going to get anything. You can't squeeze blood out of a turnip, right?

[MAIF'S DESIGNEE]: That is correct.

[APPELLANT'S ATTORNEY]: Did you ever check to see whether or not Mr. Jones had any assets? Not you. When I am talking you, I am talking about MAIF.

of the attorney assigned by MAIF to represent Jones in the motor tort case, could have concluded that MAIF had not proven to its satisfaction, particularly where Jones himself did not testify at the trial of the bad faith claim,[14] that Jones had concurred with MAIF's decision, or the attorney's recommendation, not to settle Boyce's claim for the $20,000 policy limit.

The jury also had before it the following exchange between Appellant's attorney and Ralph S. Moore, an insurance claims supervisor with 35 years of automobile-related claims experience whom Appellant called at trial as a expert witness during the trial of the bad faith claim:

**Q:** In this particular case, was there indication that Mr. Boyce would accept an offer within the policy limit of $20,000?

[MAIF'S DESIGNEE]: I understand.
[APPELLANT'S ATTORNEY]: I know you were not there.
[MAIF'S DESIGNEE]: I understand. There is no indication in the record that, that was done.

Confirming the absence of any documentary evidence that MAIF considered the possible HIC claim in deciding whether to accept or reject the policy limits offer from Boyce, MAIF's corporate designee, again in response to Appellant's counsel's cross-examination, stated:

[APPELLANT'S ATTORNEY]: Is there anything that you have written down or anyone has written down that says that the UIM carrier played any part in the amount of money that you offered Mr. Boyce?
[MAIF'S DESIGNEE]: No, there is nothing written in the chronology.
[APPELLANT'S ATTORNEY]: Nothing.
[MAIF'S DESIGNEE]: That is correct.
[APPELLANT'S ATTORNEY]: Absolutely.
[MAIF'S DESIGNEE]: That is correct.
[APPELLANT'S ATTORNEY]: And whether Harleysville was there or not, as far as you were concerned and whether there was a UIM policy or not, as far as you were concerned, you meaning MAIF—.
[MAIF'S DESIGNEE]: Right.
[APPELLANT'S ATTORNEY]: Yes, this is not against you personally.
[MAIF'S DESIGNEE]: I understand.
[APPELLANT'S ATTORNEY]: But as far as MAIF is concerned, you were not going to offer the $20,000 figure that you had in reserve, correct?
[MAIF'S DESIGNEE]: That is correct.

14. *See also* note 3, *supra.*

**A:** Yes. The MAIF file contains repeated written evidence that Mr. Boyce, through his attorney, would indeed accept an amount within the limits of the MAIF policy coverage.

**Q:** From your review of the policy, was there ever an offer made by MAIF to settle this case for the $20,000 it had in the case?

**A:** No, sir.

. . . .

**Q:** Did you form an opinion with reasonable degree of professional certainty whether or not MAIF acted in bad faith in failing to settle this case for the $20,000 policy limits when it had an opportunity to do so?

. . . .

**A:** It is my opinion that they undoubtedly acted in bad faith toward their policyholder, Mr. Jones, for failing to settle this case when they had the opportunity to do so, by forcing it into litigation and exposing him to personal bankruptcy.[15]

There was also sufficient evidence in the record for the jury reasonably to have found that MAIF did not fully investigate Boyce's claimed head injuries. Under cross-examination during the trial of the bad faith refusal to settle claim, Jones's attorney admitted that, while he and MAIF were aware that Boyce was being treated by both a neurologist and a neuropsychologist for his claimed closed head injury, MAIF did not engage either type of specialist to perform an independent examination of Boyce; rather, "a very qualified orthopedic surgeon[ ] was the only evaluation [of Boyce] for MAIF. . . ." Moreover, while addressing what MAIF should have done while it was investigating and evaluating the underlying case, Moore, Appellant's expert, faulted MAIF for hiring an orthopedist to investigate Boyce's orthopedic, neurological, and psychological claims. "Certainly if I had a plaintiff coming at me with clear neurological complaints, I would have had him

---

15. As indicated in note 4, *supra,* Boyce's claimed economic damages alone exceeded MAIF's policy limit.

examined by a neurologist and not an orthopedist [as MAIF had done]. If I had a case where a guy had a foot problem, I wouldn't be bringing in a gynecologist to testify against him."

Because the jury was provided with evidence of MAIF's failure to investigate fully Boyce's closed head injury claim and of Boyce's willingness to settle unconditionally the underlying case for Jones's $20,000 policy limit, the trial court found that there was sufficient evidence before the jury to support its finding that MAIF acted in bad faith when it refused to settle the case. We agree. Our function is not to retry the case or reweigh the evidence, but to determine whether there was sufficient evidence before the jury to support its finding that MAIF acted in bad faith when it refused to settle the motor tort claim for its policy limit.

For the very reason that the evidence bearing on bad faith in this case was of such a character that reasonable persons might differ as to whether it amounted to proof of such bad faith, we reiterate that the credibility and weight given to the evidence was the province of the jury and not of this Court. We hold that there was sufficient record evidence upon which the jury could have based its decision that MAIF failed to prove that Jones agreed that the case should not be settled and that Boyce did not offer to settle his claim against Jones unconditionally.

**B.**

MAIF also asks us whether the trial judge was correct in limiting damages in the bad faith case to the amount of money, plus interest, that Jones would have had to pay to satisfy the judgment entered against him in 1993. As we indicated in Part II.C, *supra,* the trial court erred when it gave MAIF credit for the monies paid by HIC. Reiterating that conclusion here, we answer MAIF's question in the negative; the trial judge was not correct in limiting damages in the bad faith case to the amount of money, plus interest,

that Jones would have had to have paid to satisfy the judgment entered against him in 1993.[16]

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF A REVISED JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MARYLAND AUTOMOBILE INSURANCE FUND.

---

16. We also note that the trial court erred when it applied Md.Code (1974, 1997 Repl.Vol.), § 19–513(b) of the Insurance Article to this case, for Appellant is not seeking to recover benefits from more than one motor vehicle liability insurance policy. See note 8 for the pertinent text of the code.